IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN BOUCHER,

    Plaintiff,

-vs-                        Case No. 18-cv-760-jdp

DR. MARTIN and
DEBRA TIDQUIST,

    Defendants.

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT

---

Plaintiff, John Boucher ("Boucher"), proceeding pro se, hereby submits the following response to Defendants' proposed findings of fact in opposition of Defendants' motion for summary judgment:

1.    Plaintiff John Boucher (DOC #209123) has been incarcerated at Jackson Correctional Institution (Jackson) since May 5, 2015 and was transferred from Dodge Correctional Institution. (Tidquist Decl. ¶8.)

    1.    No Dispute.

2.    The Wisconsin Department of Justice accepted service of the complaint on behalf of Dr. Martin, but before the conclusion of this case, Defendant Martin died. A stipulation Regarding Defendant Dr. W. Bradley Martin filed on September 23, 2019. (Dkt. 18.)

    2.    No Dispute.

3. Paul Bekx, M.D. has been retained or specifically employed to provide expert testimony and is currently employed as the Medical Director of the Department of Corrections' Bureau of Health Services. (Bekx Decl. ¶2; Dkt. 20.)

    3. No Dispute.

4. Defendant Debra Tidquaist is currently employed by the Corrections' Bureau of Health Services as an Advanced Practice Nurse Prescriber (APNP) at Jackson Correction Correctional Institution (Jackson). She has been licensed as an APNP (or nurse practitioner) in the State of Wisconsin continuously since March 30, 2009 and as a registered nurse since 1993. (Tidquist Decl. ¶2.)

    4. No Dispute.

5. When an inmate has a medical concern, wishes to communicate with medical staff, and/or requests to be seen by Health Services Unit (HSU) staff, he needs to fill out a Health Services Request form and submit it to HSU. (Tidquist Decl. ¶6.)

    5. No Dispute.

6. Health Services Requests are triaged by HSU staff daily. (Tidquist Decl. ¶7.)

    6. No Dispute.

7. John Boucher is a 51 year-old individual with a health history that includes chronic back pain, chronic right arm pain from a 2010 injury, and pain in his left elbow, right ankle, and shoulders. His injuries included a possible right rotator cuff injury. (Bekx Decl. ¶6; Tarver Decl. Ex. 1000 at 1-12.)

    7. No Dispute.

8.  In December of 2014, he was in a motor vehicle accident in Mexico. In the months following the accident he experienced right shoulder pain and limited range of motion. (Bekx Decl. ¶7; Tarver Decl. Ex. 1000, at 6,7.)

8.  **Dispute.** On December 11, 2014, Boucher was see by Dr. Medak Amedakus who noted "R Shldr w/ lim ROM due to pain, flex/abduction to >90 deg. Unable to internal rotate." (Boucher Decl. ¶10; Ex. 4.)

9.  An X-ray ordered by the San Diego Sheriff's office in December of 2014 showed degenerative arthrosis- a condition associated with aging. No fracture was evident. He was treated conservatively at the time with anti-inflammatory medications (Bekx Decl. 7; Tarver Decl. Ex. 1000, at 38-41.)

9.  **Dispute.** During the December 11th visit with SDCJ medical staff, Boucher's right shoulder was x-rayed. The x0ray revealed degenerative arthrosis in the right shoulder. After receiving the results Dr. Amedakus told Boucher that he would order an MRI and a consultation with an orthopedic surgeon. However, Boucher was transferred to a different jail before he was able to receive these medical services. (Boucher Decl. ¶¶12-13; Ex. 5.)

10. On February 24, 2015, Boucher underwent an intake health screening at the Dodge Correctional Institution (Dodge). (Bekx Decl. ¶8; Tarver Decl. Ex. 1000, at 1.)

10. No Dispute.

11. Boucher's intake records lists multiple health issues, including injury to left arm, elbow, and ribs, right ankle issues, and a "possible right rotator cuff injury." (Bekx Decl. ¶8; Tarver Decl. Ex. 1000, at 2.)

11. **Dispute.** While at DCI, medical staff told Boucher that an orthopedic consultation for his possible right rotator cuff injury would not be provided until after he was received at his next institution. (Boucher Decl. ¶15.)

3

12. Boucher received a Gabapentin prescription on April 6, 2015. (Bekx Decl. ¶9; Tarver. Ex. 1000, at 43.)

12. No Dispute.

13. On May 5, 2015, Boucher was transferred from Dodge to Jackson Correctional Institution (Jackson). (Bekx Decl. ¶10; Tarver Decl. Ex. 1000, at 12.)

13. No Dispute.

14. On May 7, 2015, Boucher completed a Health Services Request (HSR) in which he asked for a wheelchair. Among other reasons for the request, he cited that he had a disabled ankle and a "permanently disabled right shoulder." (Bekx Decl. ¶11; Tarver. Ex. 1000, at 13.)

14. **Dispute.** On May 7, 2015, Boucher was seen by Nurse Kostohryz of JCI's Health Services Unit ("HSU"). Nurse Kostohryz examined Boucher's ankle and shoulder. The nurse immediately summoned Dr. Martin. Shortly thereafter, Dr. Martin entered the exam room. Boucher explained to Dr. Martin that he was experiencing limited range of motion in his right shoulder with throbbing pain at a level of 8 out of 10 pain scale (and that the Naproxen was not working). Boucher further informed Dr. Martin that these symptoms had been ongoing for more than five months. Boucher then requested an MRI, a consult with an orthopedic surgeon, and a wheelchair. Instead, Dr. Martin wrote an order for a Walker (with no wheels, of course). Boucher explained to Dr. Martin that he could not use a walker because the use of a walker would exasperate his shoulder pain. (Boucher Decl. ¶¶17-20.)

15. A permanet injury increases the likelihood that the problem will be more difficult to treat later and makes a significant difference in the treatment plan. (Tidquist Decl. ¶9.)

4

15. **Dispute.** A delay in providing necessary care increases the lost opportunity to repair an injured rotator cuff. On September 30, 2016, after more than 69 weeks under Dr. Martin's care, Boucher finally received an MRI on his right shoulder. (Boucher Decl. ¶41; Ex. 21.) On October 11, 2016, Dr. Martin reviewed the MRI results of Boucher's shoulder, in which he noted tears to Boucher's rotator cuff, and Dr. Martin ordered a consultation with Dr. Grossman, an orthopedic surgeon. On November 9, 2016, Dr. Grossman examined Boucher and reviewed his x-ray and MRi results. Dr. Grossman noted that Boucher presented with obvious atrophy posteriorly, with remarkably little shoulder motion and reported severe pain. Dr. Grossman's initial impression was that Boucher had a chronic rotator cuff tear that was unrepairable. (Boucher Decl. ¶¶ 42, 44, Ex. 22 & 23.)

16. On May 9, 2015, Boucher requested through an HSR to be taken off Gabapentin. Boucher completed a Refusal of Recommended Health Care in which he described that he did not want to come to HSU anymore for health care. (Tidquist Decl. ¶11; Bekx Decl. ¶14; Tarver Decl. Ex. 1000, at 14, 15.)

16. **Dispute.** On May 9, 2015, Boucher fell and sustained injuries. He attributed this incident to Dr. Martin issuing a Walker instead of a wheelchair. Dr. Martin was aware of Boucher's ankle and shoulder, and that using a Walker would further complicate matters and to quail any risk of further injury Boucher completed a Refusal of Care form. (Boucher Decl. ¶22.)

17. Eleven months later, Boucher was next seen in HSU at his request for pain in his right shoulder on April 18, 2016. (Bekx Decl. ¶15; Tidquist Decl. ¶12; Tarver Decl. Ex. 1000 at 16-17.)

17. No Dispute.

5

18. According to the Nursing Encounter Protocol, this was the first indication of request for evaluation of right shoulder pain. Boucher reported the onset of pain was April 14, 2016. The pain in his shoulder was making it difficult to use his walker. (Bekx Decl. ¶15; Tidquist Decl. ¶13; Tarver Decl. Ex. 1000, at 16-17.)

18. **Dispute.** On May 7, 2015, Boucher requested an MRI, a consult with an orthopedic surgeon, and a wheelchair. Dr. Martin told Boucher he would **not** order an MRI. (PPFOF ¶19; Boucher Decl. ¶19.)

19. Tidquist gave a verbal order to follow up with physical therapy and provided education on range of motion. Physical therapy is a typical modality to treat injuries of shoulders. (Tidquist Decl. ¶13.)

19. **Dispute.** During Boucher's appointment with Nurse Kostoyryz on April 14, 2016, Boucher never interacted with Tidquist. Nor did Tidquist provide education on range of motion. (PPFOF ¶26; Boucher Decl. ¶26; Ex. 10.)

20. Starting on April 28, 2016, Boucher underwent physical therapy treatments to gain strength and received medication to manage pain. (Bekx Decl. ¶16; Tidquist Decl. ¶14; Tarver Decl. Ex. 1000 at 44-49.)

20. **Dispute.** Boucher did not undergo physical therapy treatment on April 28, 2016. Instead, he only received a physical therapy evaluation. Darrin Kryzanowski, a licensed Physical Therapist saw Boucher and rendered the diagnosis that Boucher's right "shoulder pain [was] most likely caused by rotator cuff compromise. He will [follow up with doctor/Nurse Practitioner]." (PPFOF ¶27; Boucher Decl. ¶27; Ex. 11.)

21. On June 16, 2016, an order was written for physical therpay to evaluate the segregation cell and patient mobility. (Bekx Decl. ¶12; Tarver Dec. Ex. 1000, at 15.)

6

21. No Dispute.

22. There are limited progress notes or medical records from around May 2015. Progress notes show a few visits in May and June of 2015 for concerns of ambulation and need of a walker/cane/wheelchair and no progress note visits from 6/16/16 to 4/18/16. There is no specific request for an MRI or to see an orthopedist in May or June of 2015. (Bekx Decl. ¶13.)

22. **Dispute.** From May 7, 2015 to April 18, 2016. Boucher was seen for his shoulder injury on two occasions. He saw Nurse Kostohryz and Dr. Martin on May 7, 2017 and saw Nurse Kostohryz on April 16, 2016, and on each of those occasions Boucher requested an MRI and to see an Orthopedic surgeon. (PPFOF ¶¶17-19, ¶¶28-30, and ¶¶33-34; Boucher Decl. ¶¶17-19, ¶¶28-30, ¶¶33-34.)

23. In Dr. Dekx's professional medical opinion, typically, for shoulder immobility and pain, an MRI or orthopedic evaluation would not be the first line of therapy. Rather, anti-inflammatory medications and physical therapy evaluation and treatment would be first line therapies. MRI and orthopedic referral would be indicated if these conservative measures did not result in improvement. (Bekx Decl. ¶13.)

23. **Dispute.** Given Boucher's exceedingly severe symptoms, Boucher should have been immediately ordered an MRI and orthopedic consult. A delay in providing necessary care increases the lost opportunity to repair an injured rotator cuff. On September 30, 2016, after more than 69 weeks under Dr. Martin's care, Boucher finally received an MRI on his right shoulder. On October 11, 2016, Dr. Martin reviewed the MRI results in which he noted tears to Boucher's rotator cuff, and Dr. Martin ordered a consultation with Dr. Grossman, an orthopedic surgeon. On November 9, 2016, Dr. Grossman concluded that Boucher had a chronic rotator cuff tear that was unrepairable. (PPFOF ¶¶41-42 and 44; Boucher Decl. ¶¶ 41-42 and 44.)

24. Boucher continued with physical therapy treatments and medication to gain strength and to manage pain. He was seen by physical therapy multiple times from May through August of 2016 and made progress in both range of motion and strength. (Bekx Decl. ¶17; Tarver Decl. Ex. 1000, at 44-49.)

24. **Dispute.** On May 20, 2016, Boucher submitted another HSR to complain that the physical therapy exercise had "caused more pain and I have not been diagnosed. Something is wrong in my shoulder for a long time now." (PPFOF ¶¶31-32; Boucher Decl. ¶¶31-32, Ex. 13-14.)

25. On August 17, 2016, physical therapy noted that Boucher plateaued in progress and was "near maximum benefit of [physical therapy]." Boucher was instructed to follow up with a physician and continue physical therapy one time per week unless otherwise directed. (Bekx Decl. ¶18; Tarver Decl. 1000, at 21.)

25. **Dispute.** During the summer of 2016, Boucher attended therapy for his shoulder. Specifically, he attended therapy on July 8, July 19, August 1, and August 20. During that time Boucher continued to experience limited range of motion and severe pain in his right shoulder. (PPFOF ¶37; Boucher Decl. ¶37, Ex. 18.)

26. On September 1, 2016, Dr. Martin recommended Boucher to get a plain X-ray of his right shoulder. Dr. Martin indicated Boucher had right shoulder pain with abnormalities but full range of motion. (Bekx Decl. ¶19; Tarver Decl. Ex. 1000, at 22, 23.)

26. **Dispute.** Dr. Grossman examined Boucher and reviewed his x-ray and MRI results. Dr. Grossman noted that Boucher presented with obvious atrophy posteriorly, <u>with remarkably little shoulder motion and reported severe pain.</u> (PPFOF ¶44; Boucher Decl. ¶44, Ex. 23.)

8

27. According to a September 7, 2016 Radiology Report of the right shoulder X-ray, the glenohumeral joint was in alignment, but there was narrowing of the joint space due to modest degenerative changes. The report indicates that the acromioclavicular coracoclavicular joints also were normal and that no shoulder fracture, separation or dislocation was seen. The conclusion was "modest degenerative joint disease of the right shoulder; otherwise, no fracture or dislocation seen." (Bekx Decl. ¶20; Tarver Decl. Ex. 10000, at 25.)

27. No Dispute.

28. Because of the plateau in PT, continued pain and plain X-ray results on September 14, 2016, Dr. Martin referred Boucher for an MRI of the right shoulder. (Bekx Decl. ¶21; Tidquist Decl. ¶15; Tarver Decl. Ex. 10000, at 23, 24, 27, 33, 38-42.)

28. No Dispute.

29. On September 19, 2016, Tidquist scheduled Boucher's MRI for his right shoulder for better assessment of his injury. (Tidquist Decl. ¶15; Tarver Decl. Ex. 1000, at 42.)

29. **Dispute.** On September 14, 2016, Dr. Martin sent a request for prior authorization for an MRI and an orthopedic surgery consultation to the Bureau of Health Services. (PPFOF ¶40; Boucher Decl. ¶40, Ex. 20.)

30. On September 30, 2016, Boucher underwent MRI imaging at Black River Hospital. The impression indicated a "full-thickness supraspinatus and anterior aspect of infraspinatus tendon tear" and "severe-fatty atrophy of supraspinatur infraspinatus muscles." (Bekx Decl. ¶22; Tarver Decl. Ex. 1000, at 26.)

30. No Dispute.

31. On October 11, 2016, Boucher met Dr. Martin and because of the results of the MRI showing significant anatomical tears and the plateau in physical therapy, a referred was arranged for an orthopedic consult for his right shoulder rotator cuff tear. (Bekx Decl. ¶23; Tarver Decl. Ex. 1000, at 24, 33.)

31. No Dispute.

32. On November 9, 2016, Boucher received an orthopedic consultation with Dr. Grossman. Dr. Grossman indicated that Boucher had a chronic rotator cuff tear which was unrepairable. (Bekx Decl. ¶24; Tidquist Decl. ¶16; Tarver Decl. Ex. 1000, at 29.)

32. No. Dispute.

33. Large retracted tears with significant muscle atrophy may not be repairable. When the muscle is replaced by fat, as in this case, recovery of strength and function is not possible. Atrophy is caused by inactivity of the muscle and the common treatments are exercise and physical therapy which Boucher had already been receiving. Muscle atrophy of this degree is not reversible. There was discussion on other treatment options including the need for possible future arthroplasty (shoulder replacement) (Bekx Decl. ¶25; Tarver Decl. Ex. 1000, at 28, 31.)

33. **Dispute.** A delay in providing necessary care increases the lost opportunity to repair an injured rotator cuff. On September 30, 2016, after more than 69 weeks under Dr. Martin's care, Boucher finally received appropriate medical care for his right shoulder. (PPFOF ¶41; Boucher Decl. ¶41, Ex. 21.)

10

34. Dr. Grossman administered a Depo-Medrol injection which had no immediate improvement for Boucher's discomfort. Dr. Grossman stated that the "failure to respond to injection therapy is a grave prognostic indicator for any type of operation intervention." (Bekx Decl. ¶26; Tidquist Decl. ¶16, Tarver Decl. Ex. 1000, at 29-30.)

34. No Dispute.

35. Boucher also underwent another X-ray of the right shoulder on November 9, 2016. The X-ray results indicated mild degenerative changes at the shoulder joint and mild elevation of the humeral head relative to the glenoid. ( Bekx Decl. ¶27; Tarver Decl. Ex. 1000, at 32.)

35. No Dispute.

36. On November 30, 2016, Dr. Martin followed up with Boucher and recommended return to physical therapy since surgery was not an option as a course of treatment. (Bekx Decl. ¶28; Tarver Decl. Ex. 1000, at 34.)

36. No Dispute.

37. Physical therapy, home exercise programs, and pain medications are typical treatment options for shoulder injuries like Boucher's when surgery is not an option. (Tidquist Decl. ¶17.)

37. **Dispute.** A second opinion and/or arthroplasty (shoulder replacement.)

38. Boucher continued with physical therapy since surgery was not an option as a course of treatment due to his injury being unrepairable. Boucher had severe atrophy which limits treatment for shoulder injuries. (Tidquist Decl. ¶18; Tarver Decl. Ex. 1000, at 34-36.)

38. No Dispute.

11

39. Dr. Bekx's professional opinion is that the care provided to Mr. Boucher met the standard of care for this condition. In general, shoulder injuries are first treated concervatively with anti-inflammatory medications and physical therapy. Many shoulder conditions respond to these initial interventions and thus surgery can be avoided. (Bekx Decl. ¶29.)

39. **Dispute.** Given Boucher's exceedingly severe symptoms, Boucher should have been immediately ordered an MRI and orthopedic consult. A delay in providing necessary care increases the lost opportunity to repair an injured rotator cuff. On May 7, 2015, Boucher requested an MRI and orthopedic consultation but Dr. Martin delayed appropriate care for more than 69 weeks, until September 30, 2016. (PPFOF ¶1¶¶ 19, 41-42 and 44; Boucher Decl. ¶19, ¶¶41-42 and ¶44.)

40. During Mr. Boucher's physical therapy sessions in the summer of 2016, he was making progress in both strength and range of motion. When he plateaued in his improvement and still experienced deficiencies, the appropriate referral was made to orthopedics. (Bekx Decl. ¶29.)

40. **Dispute.** During the summer of 2016, Boucher attended physical therapy for his shoulder. Specifically, he attended therapy on July 8, July 19, August 1, and August 20. During that time Boucher continued to experience limited range of motion and severe pain in his right shoulder.(PPFOF ¶37; Boucher Decl. ¶37.)

41. Boucher returned to physical therapy on December 15, 2016, following his orthopedic evaluation. (Bekx Decl. ¶30; Tarver Decl. Ex. 1000, at 35.)

41. No Dispute.

12

42. For the next year, Boucher continued on physical therapy and medication to manage his right shoulder pain. He did also receive a shoulder injection on March 28, 2017 with some relief of his pain. (Bekx Decl. ¶31; Tarver Decl. Ex. 1000, at 36.)

42. **Dispute.** Boucher experienced frozen shoulder with extreme pain on January 2, 2017; March 10, 2017; May 5, 2017; May 25, 2017; May 31, 2017; June 6, 2017; June 9, 2017; June 18, 2017, June 27, 2017, July 4, 2017; July 20, 2017; and November 8, 2017. (PPFOF ¶46; Boucher Decl. ¶46.) Boucher wote multiple times to JCI's Health Services Unit explaining that he was in constant pain and that physical therapy was not working. Yet, Boucher was ignored and no alternative was given. (PPFOF ¶47; Boucher Decl. ¶47; Ex. 24-35.)

43. On July 3, 2018, it was reaffirmed that Boucher was still not a candidate for surgery. (Bekx Decl. ¶31; Tarver Decl. Ex. 1000, at 36.)

43. No Dispute.

44. Boucher appears to have reported two separate injuries - an injury in 2010 causing right arm pain and the December 2014 bike vs car accident in Mexico. In Dr. Bekx's professional medical opinion, it is impossible to tell which injury--the 2010, 2014, both or neither--caused the rotator cuff tear. (Bekx Decl. ¶32.)

44. **Dispute.** Boucher reported only one injury: a bicycling accident (in Mexico) in which he was hit by a car that left a massive tendon rupture in his right rotator cuff. (PPFOF ¶3; Boucher Decl. ¶3; Compl. ¶7.) This lawsuit is about only the 2014 injury.

45. By the time of Boucher's specific request for treatment of his shoulder pain on April 18, 2016, Dr. Bekx's opines that the muscle atrophy and fatty replacement had very likely already occurred and the outcomes

13

would have not changed if an MRI or orthopedic evaluation would have bbe done sooner in 2015 or 2016. (Bekx Decl. ¶32.)

45. **Dispute.** A failure by Dr. Martin and Tidquist to examnine Boucher's shoulder for the presence of a rotator cuff rupture, and their failure to provide a referral for MRI and orthopedic consultation that may have resulted in a better outcome or a successful surgery was inappropaiate On May 7, 2015 and again on April 18, 2016, Boucher relayed a specific set of physical complaints that should have alerted Dr. Martin that an injury had occurred to his rotator cuff. (PPFOF ¶¶17-19. ¶¶28-30 and ¶¶33-34; Boucher Decl. ¶¶¶¶¶¶17-19, 28-30, 33-34.)

46. It is Dr. Bekx's professional opinion that the treatment provided for Boucher's right shoulder in 2015 and 2016 by Dr. Martin, Nurse Tidquist and others is consistent with medical standards of care and in accordance with DOC policies and procedures. (Bekx Decl. ¶33.)

46. **Dispute.** Given Boucher's exceedingly severe symptoms, Boucher should have been immediately order an MRI and orthopedic consult. A delay in providing necessary care increases the lost opportunity to repai an injured rotator cuff. On May 7, 2015, Boucher requested an MRI and orthopedic consult but Dr. MArtin delayed appropriate care for more than 69 weeks, until September 30, 2016. (PPFOF ¶¶19, 41-42 and ¶44; Boucher Decl. ¶¶¶19, 41-42 and ¶44.)

47. In Dr. Bekx's professional medical opinion, Dr. Martin's referral for an MRI and orthopedic consult in 2016 appears to be have been appropriate. Medical care for Boucher's right shoulder was not denied or delayed in a manner which resulted in injury or pain. (Bekx Decl. ¶33.)

47. **Dispute.** Given Boucher's exceedingly severe symptoms, Boucher should have been immediately ordered an MRI and orthopedic consult. A delay in providing necessary care increases the lost opportunity to repair an injured rotator cuff. On May 7, 2015, Boucher requested an MRI and orthopedic consult but Dr. Martin delayed appropriate care for more than 69 weeks, until September 30, 2016. (PPFOF ¶¶ 19, 41-42 and ¶44; Boucher Decl. ¶¶ 19, 41-42 a,d ¶44.)

Dated this 23 day of December, 2019.

Respectfully submitted,

*John W. Boucher*

John Boucher
Pro se Plaintiff
Jackson Correctional Inst.
P.O. Box 233
Black River Falls, WI 54615

15